## GREAT NORTHERN INVESTMENTS, INC. v. COMMISSIONER OF TAXATION.

127 N. W. (2d) 444.

March 20, 1964—No. 38,871.

N. W. (2d) 161, 169; Winn v. United States (9 Cir.) 272 F. (2d) 282. Cf. State v. Keneally, 142 Mont. 256, 266, 384 P. (2d) 770, 776.

*Walter F. Mondale,* Attorney General, and *Jerome J. Sicora,* Special Assistant Attorney General, for relator.

*John W. Windhorst, Paul G. Zerby,* and *Dorsey, Owen, Marquart, Windhorst & West,* for respondent.

NELSON, JUSTICE.

Certiorari upon the relation of the commissioner of taxation to review a decision of the Board of Tax Appeals reversing an order of the commissioner which had denied a claim for refund of income taxes paid by Great Northern Investments, Inc. (hereinafter referred to as taxpayer or Great Northern). The board held that additional tax had been assessed erroneously because certain distributions made by Northwestern Fire and Marine Insurance Company (hereinafter referred to as Northwestern) to the taxpayer had been made in partial liquidation under Minn. St. 290.135, subd. 4(a)(2). If the distributions were in partial liquidation the parties agree that the amounts are treated "as in part or full payment in exchange for the stock" by § 290.134, subd. 1(a)(2), and no gain or loss is recognized to the taxpayer under § 290.135, subd. 2. The question presented is whether the board erred in finding that the distributions were in partial liquidation of Northwestern.

The commissioner and Great Northern entered into a comprehensive stipulation as to the facts and the only testimony given at the

hearing before the board was that of T. R. Anderson, the president of Great Northern.

The taxpayer, Great Northern, was a corporation organized under the laws of Delaware with its principal office in Wayzata, Minnesota. Since its incorporation in 1952 its business had been investments in securities. Northwestern was a Minnesota corporation with its principal offices in Minneapolis. It was licensed to operate in 49 states and the District of Columbia. Since 1915 its business had been managed entirely by Hartford Fire Insurance Company (hereinafter referred to as Hartford) under contracts whereby Hartford's personnel wrote all policies and a percentage of all premiums was paid to Northwestern. In addition the contracts allowed Hartford to terminate the arrangement upon 6 months' notice.

In 1958 such notice was given by Hartford, to take effect December 31, 1958. It was agreed that Hartford would assume all liability on the insurance contracts in force. Northwestern would then have no employees, office equipment, or facilities to continue the insurance business, but would own a sizeable portfolio of securities with a fair market value in excess of $6,000,000.

Aware of this situation, the taxpayer determined to acquire Northwestern's portfolio of securities by obtaining ownership of Northwestern's stock and then completely liquidating Northwestern. Between June 1958 and May 1959 the taxpayer purchased 110,218 of Northwestern's 113,766 shares of stock outstanding at a cost of $4,630,877.86. To make this purchase it was necessary for the taxpayer to sell practically its entire list of stocks and securities and also to take out a substantial bank loan. Ultimately over 95 percent of the taxpayer's assets were made up of Northwestern stock.

In 1958 the commissioner of insurance made it known that he would not approve the complete liquidation and dissolution of Northwestern. On January 5, 1959, the directors of the taxpayer adopted a plan to liquidate Great Northern completely as well as a plan whereby Northwestern would be liquidated—

"* * * either (a) through a reduction of the capital of Northwestern, a distribution by said corporation to its stockholders, including the

Company [Great Northern], of all of its surplus, and the subsequent sale by the Company of its shares of Northwestern at a price to be determined by the directors of the Company, or (b) through the liquidation and dissolution of Northwestern in the manner provided by the statutes of the State of Minnesota."

From the date of the adoption of this plan, T. R. Anderson, then president of both the taxpayer and Northwestern, devoted his entire time to effecting the complete liquidation of Northwestern. At the same time, however, alternative plan (a) was pursued. On January 29, 1959, a plan was submitted for ruling to the commissioner of internal revenue which proposed reduction of the stated capital of Northwestern from $1,250,000 to $100,000, distribution of all of Northwestern's assets exceeding $100,000 in redemption of 95 percent of Northwestern's outstanding stock, and sale of the remaining shares in Northwestern for $225,000 (the amount over $100,000 representing the value placed on Northwestern's insurance licenses). Efforts to find a purchaser were carried on, but chances of success appeared slight. As an alternative to the sale of Northwestern stock, negotiations were entered into with a small insurance company, Guaranty Security Insurance Company (hereinafter referred to as Guaranty), for a merger of the companies on the basis of a reduction of Northwestern's assets to $750,000 and an exchange of the stock in Northwestern for stock in the surviving corporation.

While these alternatives were being pursued, and as a step pursuant to each of them (regardless of which should finally be adopted), on April 13, 1959, Northwestern authorized a distribution of $50 per share under the general plan of liquidation. This distribution was out of earnings and profits accumulated by Northwestern since December 31, 1932, and resulted in the elimination of its surplus. The taxpayer received its distribution in the form of securities having a basis to Northwestern of $1,723,995.27. The market value on the date of payment, May 10, 1959, was $5,511,574.47.

By June 1959 it appeared that the only feasible course open to Northwestern was to merge with Guaranty, the contemplated merger requiring that Northwestern reduce its net worth to $750,000. To that

end, and in accordance with alternative (a) of the plan of January 5, on June 12, 1959, Northwestern reduced its capital by changing the par value of its stock from $10 to $5. By so doing further distributions were made possible which would reduce Northwestern's net worth to $750,000 without impairing capital. On June 18, 1959, Northwestern authorized distribution of all its assets in excess of $750,000, as a result of which the taxpayer received $881,984 on that date and $17,342.67 on July 1, 1959. Under the merger agreement, which was executed on June 18, Northwestern was the surviving corporation but was to be operated under Guaranty's name. Each share of Northwestern stock was exchanged for .614489 of a share in the surviving corporation, the taxpayer receiving Guaranty stock having a total par and market value of $338,740.

Thereafter the taxpayer undertook complete liquidation. As of September 30, 1959, it had ceased operations and distributed to its shareholders the sum of $3,070,970 and 67,609 of its 67,748 shares in Guaranty, leaving its net worth $195,682.46 exclusive of contingent liabilities, including the tax here involved.

From the above transactions the taxpayer received a total sum of $6,749,641.14 on an investment of $4,630,877.86 for a gain of $2,118,763.28. This amount was reported as unrecognized gain under § 290.135, subd. 2, on the taxpayer's final Minnesota income tax return for the year ending September 30, 1959. By order dated July 11, 1960, the commissioner of taxation treated said amount as dividend income and assessed a tax of $134,642.16 with $3,081.82 interest. Great Northern paid the tax assessed but filed its claim for refund, which was rejected by the commissioner. His action was reversed by the Board of Tax Appeals, which found the distributions to have been made in partial liquidation.

When this matter was presented to the board, the taxpayer advanced several alternative arguments, only one of which was the claim that the distributions were made in partial liquidation. These same alternative positions have been taken by it in its argument before this court. At least at the outset, however, we need only concern ourselves with reviewing the ground upon which the board based its de-

cision. Hence, the issue presented is whether the board erred in holding the distributions to have been made in partial liquidation. If the board correctly decided this issue, the taxpayer is relieved of recognizing any gain thereon since it is admitted that it adopted a 12-month liquidation plan pursuant to Minn. St. 290.135, subd. 2. Judging from the parties' oral arguments and briefs, the real dispute herein centers upon the $50-per-share distribution of April 13, 1959. This fact was also noted by the board in its memorandum:

"The only controversy that appears to the Board concerns itself with the distribution of $50 per share on April 13, 1959."

Accordingly, it is to this distribution that we primarily direct our attention.

Section 290.135, subd. 4(a), provides in part:

"For purposes of sections 290.131 through 290.138 distribution shall be treated as in partial liquidation of a corporation if:

\* \* \* \* \*

"(2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of clause (b). A partial liquidation includes a redemption of stock to which section 290.131, subdivision 2 applies."

The commissioner contends that the distributions did not qualify as being in partial liquidation because they were not made pursuant to a plan of liquidation, were essentially equivalent to a dividend, and were not in redemption of stock.

■ Whether the distributions were pursuant to a plan of liquidation is a question of fact for determination by the board. It is well established that this court's scope of review is limited to those grounds specified in Minn. St. 271.10, subd. 1, which provides in part:

"\* \* \* Such review may be had on the ground that the board was without jurisdiction, that the order of the board was not justified by

the evidence or was not in conformity with law, or that the board committed any other error of law."

Oliver Iron Min. Co. v. Commr. of Taxation, 247 Minn. 6, 76 N. W. (2d) 107.

Where the question is solely one of fact, "our function as a court of review * * * is to determine whether there is reasonable evidence to sustain the findings." Anderson v. Commr. of Taxation, 253 Minn. 528, 536, 93 N. W. (2d) 523, 530, citing Oliver Iron Min. Co. v. Commr. of Taxation, *supra*. See, also, Miller v. Commr. of Taxation, 240 Minn. 18, 59 N. W. (2d) 925; Western Auto Supply Co. v. Commr. of Taxation, 245 Minn. 346, 71 N. W. (2d) 797; Stronge & Lightner Co. v. Commr. of Taxation, 228 Minn. 182, 36 N. W. (2d) 800. The board is the trier of fact and it must determine the probative value of the testimony. Except when the board's action is arbitrary, oppressive, or unreasonable, this court is not permitted to substitute its judgment on the facts for that of the board. Oliver Iron Min. Co. v. Commr. of Taxation, *supra*.

■ We cannot agree that the decision of the board is without reasonable support in the evidence. The acknowledged purpose of the taxpayer's acquisition of the Northwestern stock was to acquire the latter's portfolio of securities through liquidation. A plan of liquidation was adopted as early as January 5, 1959, and the uncontroverted testimony of the president of both the taxpayer and Northwestern was that the distribution of April 13, 1959, was of the kind contemplated when the plan was adopted. He testified that—

"* * * once we had our meeting on January 5th my whole objective was * * * to release funds [from Northwestern] at the earliest possible date and bring them through [to taxpayer] so that complete liquidation could ultimately take place of both companies * * *."

This evidence reasonably supports the board's finding that the distributions were made pursuant to a plan of liquidation. Hence, a reversal of that finding would be outside the scope of our review.

■ We said in Anderson v. Commr. of Taxation, *supra,* that whether a distribution is essentially equivalent to a dividend is a question of

fact. In determining that question, however, the courts have adopted numerous "judicial criteria" to serve as aids. Though it is ultimately a question of fact whether a distribution meets such criteria, their selection and application are matters of law. Under the circumstances it is within this court's scope of review under § 271.10 to examine the criteria employed by the board to see that they conform with the law before deciding whether the evidence reasonably supports the board's findings.

The board, according to its memorandum, considered the issue of dividend equivalence solely in terms of the so-called contraction criterion. It found that the distribution of April 13, 1959, was made in conjunction with a general contraction of business and was therefore not essentially equivalent to a dividend under § 290.135, subd. 4(a)(2). This court has not previously been called upon to construe § 290.135, subd. 4(a)(2). Section 346(a) of the 1954 Internal Revenue Code,[1] however, is practically identical with our provision and guidance may therefore be sought in the Federal cases, regulations, rulings, and other interpretive sources concerned with § 346(a). See, State v. Stickney, 213 Minn. 89, 5 N. W. (2d) 351.

The Federal cases interpreting § 346(a) and a corresponding section of the 1939 Internal Revenue Code, § 115(g),[2] contain a multitude of criteria to test dividend equivalence. See, Flanagan v. Helvering, 73 App. D. C. 46, 48, 116 F. (2d) 937, 939. But more commonly the courts have applied four criteria, three of which are argued by the commissioner as justifying a finding of dividend equivalence. These are (1) whether the distributions were out of earnings and profits; (2) whether the distributions altered the proportionate interest of the stockholders in the corporation; and (3) whether the distributions were made for a bona fide business purpose rather than for the sole benefit of the stockholders. The other criterion is the business-contraction theory relied upon by the board in the instant case.

It appears that in Kirschenbaum v. Commr. of Int. Rev. (2 Cir.) 155 F. (2d) 23, 170 A. L. R. 1389, certiorari denied, 329 U. S. 726,

---

[1]68A Stat. 110, 26 USCA, § 346(a).
[2]53 Stat. 48.

67 S. Ct. 75, 91 L. ed. 628, the court raised the possibility of interpreting § 115(g) of the Internal Revenue Code of 1939 to treat all distributions out of earnings and profits as essentially equivalent to a dividend. This approach was based upon the broad language employed by Mr. Justice Frankfurter in Commr. of Int. Rev. v. Estate of Bedford, 325 U. S. 283, 65 S. Ct. 1157, 89 L. ed. 1611. The Bedford case involved a reorganization, raising the issue of whether the exchange therein between the corporation and its stockholders had the "effect of the distribution of a taxable dividend" under § 112(c)(2) of the 1939 Internal Revenue Code[3] (now § 356[a][2]).[4] In construing § 112(c)(2) the court in the Bedford case referred to § 115(a) of the 1939 code,[5] which defined "dividend" (except in specified sections of the chapter) as "any distribution made * * * out of [corporate] earnings and profits." (Minn. St. 290.133, subd. 1, is similar.) The court's language seems to indicate that § 115(a) was to be read into § 112(c)(2) so that any distribution out of earnings and profits has the effect of a distribution of a dividend.[6] The Bedford case has subsequently been relied upon as authority for the so-called "automatic dividend equivalence" theory. Ross v. United States, 146 Ct. Cl. 223, 173 F. Supp. 793, certiorari denied, 361 U. S. 875, 80 S. Ct. 138, 4 L. ed. (2d) 113. It is clear that the commissioner seeks to give a similar construction to Minn. St. 290.133, subd. 1, and 290.135, subd. 4(a)(2).

However desirable it might be to tax as dividends all earnings and profits distributed in redemption of stock, we think that to read such a standard into § 290.135, subd. 4(a)(2), would involve a gross misapplication of the Bedford case as well as an unreasonable construction

---

[3]53 Stat. 39.

[4]68A Stat. 115, 26 USCA, § 356(a)(2).

[5]53 Stat. 46.

[6]The Bedford case has been the subject of much discussion. See, e. g., Darrell, *The Scope of Commissioner v. Bedford Estate*, 24 Taxes 266; Moore, *Taxation of Distributions Made in Connection with a Corporate Reorganization*, 17 Tax L. Rev. 129; Nolan, *The Uncertain Tax Treatment of Stock Redemptions: A Legislative Proposal*, 65 Harv. L. Rev. 255.

of this statute. See, Bittker and Redlich, *Corporate Liquidations and the Income Tax,* 5 Tax L. Rev. 437, 475. Cases handed down subsequent to the Bedford decision have limited its holding to the particular facts before the court and have expressly rejected the notion that all distributions out of earnings and profits are essentially equivalent to a dividend. See, Snite v. Commr. of Int. Rev. 10 T. C. 523, affirmed sub nom. Commr. of Int. Rev. v. Snite (7 Cir.) 177 F. (2d) 819; Imler v. Commr. of Int. Rev. 11 T. C. 836; Lockhart v. Commr. of Int. Rev. 8 T. C. 436; Idaho Power Co. v. United States, 142 Ct. Cl. 534, 161 F. Supp. 807, certiorari denied, 358 U. S. 832, 79 S. Ct. 53, 3 L. ed. (2d) 70; Ross v. United States, *supra.* On the basis of these authorities the board did not commit error in failing to apply the earnings and profits test as suggested by the commissioner.

The commissioner contends that a distribution which does not alter the proportionate interests of the shareholders in a corporation is essentially equivalent to a dividend since a basic characteristic of all dividends is their failure to affect the shareholders' interests. Such a position is not without authority. In Ferro v. Commr. of Int. Rev. (3 Cir.) 242 F. (2d) 838, 841, the court stated, "Where a distribution of corporate assets * * * leaves proportionate interests unchanged, that circumstance has been termed 'the most significant factor in finding dividend equivalence,' " citing Nolan, *The Uncertain Tax Treatment of Stock Redemptions: A Legislative Proposal,* 65 Harv. L. Rev. 255. But to apply this criterion would be to deny partial-liquidation treatment to all distributions made to shareholders pro rata, since a pro rata distribution in redemption of part of a corporation's stock would not alter the proportionate interests of the stockholders. This result has been rejected in Sullivan v. Commr. of Int. Rev. 17 T. C. 1420, affirmed sub nom. Commr. of Int. Rev. v. Sullivan (5 Cir.) 210 F. (2d) 607, and Atlantic Nat. Bank v. Fahs, 55-2 CCH, U.S.T.C. par. 9618, where distributions were held to be in partial liquidation although pro rata.

As also convincing of the impropriety of applying this criterion, we accept Senate Report No. 1622, 83d Cong. 2d Sess. p. 49, with respect to § 346(a) of the 1954 Internal Revenue Code which corresponds

to Minn. St. 290.135, subd. 4(a)(2). That report contains the following statement:

"* * * Existing law is complicated by the fact that stock redemptions are included within the terms of the partial liquidation provisions. Thus, a redemption of all of the stock of 1 of 2 sole shareholders of a corporation may result in capital-gain treatment to the redeemed shareholder. The result occurs, however, not by reason of the use of any particular assets of the corporation to effect the redemption but because the distribution *when viewed at the shareholder level* is so disproportionate with respect to the outstanding shareholder interests as not to be substantially equivalent to a dividend.

"Your committee, as did the House bill, separates into their significant elements the kind of transactions now incoherently aggregated in the definition of a partial liquidation. Those distributions which may have capital-gain characteristics because they are not made pro rata among the various shareholders would be subjected, *at the shareholder level,* to the separate tests described in part I of this subchapter [§ 302(b),[7] to which Minn. St. 290.131, subd. 2, corresponds]. On the other hand, those distributions characterized by what happens solely *at the corporate level* by reason of the assets distributed would be included as within the concept of a partial liquidation.

"The general language of the proposed draft would include within the definition of a partial liquidation the type of cases involving the contraction of the corporate business. Such as for example, cases which hold that if the entire floor of a factory is destroyed by fire, the insurance proceeds received may be distributed *pro rata* to the shareholders without the imposition of a tax at the rates applicable to the distribution of a dividend * * *. Voluntary bona fide contraction of the corporate business may of course also qualify * * *." (Italics supplied.)

The 1954 code therefore—the relevant provisions of which are identical to Minnesota statutes—intended to withdraw the "proportionate interest" test (as well as other considerations at the shareholder level) from § 346(a) and restrict it to § 302(b). Section 302(b) sets

---

[7] 68A Stat. 86, 26 USCA, § 302(b).

down the general rule for tax treatment of distributions received in redemption of stock and the proportionate-interest criterion is expressly included in its provisions. But this is not the case with § 346(a)—nor the corresponding Minnesota statute, Minn. St. 290.135, subd. 4(a)(2). As stated by the Senate report, whether a distribution is essentially equivalent to a dividend or in partial liquidation is to be determined on the level of the corporation and not on the shareholder level. Accordingly, if a distribution qualifies as being in partial liquidation under tests at the corporate level, the recipient shareholder is entitled to treat it as a capital gain under § 331[8] (to which Minn. St. 290.134 corresponds), although it would be treated as dividend income under § 302(b).

In view of the change in the 1954 code and the accompanying legislative history, it seems apparent that the "proportionate interest" test advanced by the commissioner has been rejected as a test of dividend equivalence in partial liquidation. The board did not err in failing to apply it in the present case.

The commissioner further contends that a distribution is essentially equivalent to a dividend when made without a bona fide business purpose on the part of the corporation and solely for the benefit of the shareholders. Numerous cases can be found in which distributions were denied partial-liquidation treatment on the ground that they lacked a business purpose. See, e. g., Flanagan v. Helvering, *supra;* Smith v. United States (3 Cir.) 121 F. (2d) 692. Bittker and Redlich, in *Corporate Liquidations and the Income Tax,* 5 Tax L. Rev. 437, 470, state that "[t]he most important single factor * * * in the interpretation of section 115(g) [of the 1939 code] has been the test of 'legitimate business purpose.' "

In Anderson v. Commr. of Taxation, *supra,* this court cited with approval Lewis v. Commr. of Int. Rev. (1 Cir.) 176 F. (2d) 646, 650, in which the court said:

"* * * To seek to differentiate between 'corporate purpose' and 'shareholder purpose' is unrealistic and impractical, particularly with

---

[8]68A Stat. 101, 26 USCA, § 331.

respect to closely held corporations. * * * The separate legal identity of these corporations should not obscure the fact that they are operated by their shareholders in a manner thought best calculated to serve the latter's interests. What is deemed best for the shareholders is deemed best for the corporation, and vice versa."

While neither of these cases involved partial liquidations, the view espoused could be extended with similar justification to the instant case. But, assuming that business purpose is a proper criterion for determining dividend equivalence, the evidence reasonably supports a finding that Northwestern made the distributions of April 13, 1959, for a bona fide business reason. Since 1915 Northwestern's insurance business had been managed entirely by Hartford. On December 31, 1958, under the provisions of its contract with Northwestern, Hartford ended that arrangement. Northwestern was left with no employees, no office equipment, or facilities. Its only assets consisted of its licenses to operate in Minnesota and other states, and its portfolio of securities. Under such circumstances it would not have been at all unreasonable for the Board of Tax Appeals to find that Northwestern was motivated by legitimate business considerations in deciding to distribute its portfolio of securities to its shareholders and liquidate itself to the extent permitted by the commissioner of insurance. In Lockhart v. Commr. of Int. Rev. 8 T. C. 436, 441, the court found a valid business purpose in "[t]he partial distribution of corporate assets in order that they may, in the opinion of the stockholders, be more efficiently or better used or operated in some other way, such as by individuals." This may well have been the reasoning of Northwestern after Hartford had terminated the contract under which Northwestern had operated for almost 50 years.

It is true that Great Northern purchased Northwestern stock specifically to acquire the portfolio of securities through liquidation. It might well have attempted to do so even if the contract with Hartford had not been terminated. But the contract was, in fact, ended. If corporate and shareholder purposes are to be distinguished, and if the corporate entity is to be separated from the controlling shareholder, when a business purpose in the conduct of corporate affairs is reasonably evidenced it ought not to be struck down because it also satisfies and

coincides with shareholder interest. Though the board apparently failed to consider the business-purpose criterion, it did not err in finding the distributions not to be essentially equivalent to a dividend. The facts of this case reasonably fulfill the business-purpose test.

The standard applied by the board in determining the dividend equivalence of the distributions herein was the "business-contraction" test. Federal cases too numerous to cite affirm that this is a proper criterion to adjudge dividend equivalence. The Senate report relating to the 1954 code expressly adopted the test, as follows (S. Rep. No. 1622, 83d Cong. 2d Sess. p. 262):

"Subsection (a) is intended to provide a definition of partial liquidation which replaces that contained in section 115(i) of the 1939 Code. Primarily, this definition involves the concept of 'corporate contraction' as developed under existing law. * * *

"It is intended that a genuine contraction of the business as under present law will result in partial liquidation. See, for example, Joseph Imler (11 T. C. 836) * * *."

Both the Federal and the Minnesota income tax regulations expressly adopt the business-contraction test, using the Imler case as an example. See, Internal Revenue Service Regulation, 26 CFR (Rev. 1961) § 1.346-1; Minn. Income Tax Regulations, Reg. 2013.5 (4)-1(a).

In view of the foregoing there can be no dispute as to the correctness of the board's application of the contraction theory to determine dividend equivalence. The issue remaining is simply the fact question whether the evidence reasonably supports the board's findings that Northwestern incurred a contraction of its corporate business.[9] We conclude that the findings of the board are entitled to affirmance.

The distributions made by Northwestern reduced its assets from something over $6,000,000 to $750,000. Northwestern continued to exist as a corporate entity, but after distributing its portfolio of securities it was incapable of engaging in the insurance business to the extent that it had previously. Northwestern had held the portfolio to cover

---

[9]See the cases cited supra as to this court's scope of review on fact issues.

losses arising under the policies it had written.[10] With the portfolio gone[11] and only $750,000 in remaining assets, Northwestern was necessarily required to contract the scope of its business.

The commissioner argues that no genuine contraction occurred because Northwestern remained licensed to do business as before and continued in the insurance business after merging with Guaranty. But the fact it was licensed does not affect the crucial question of whether Northwestern in actuality contracted its business from what it had formerly been. Nor is that issue wholly resolved by Northwestern's continued activity in the insurance field after its merger with Guaranty. In Straub v. Commr. of Int. Rev. 29 B. T. A. 216, 220, affirmed sub nom. Commr. of Int. Rev. v. Straub (3 Cir.) 76 F. (2d) 388, the court said:

"* * * [W]hile the business continued in operation, its scope was steadily narrowed. That it was not immediately discontinued is not, as respondent contends, necessarily an indication that liquidation was not taking place. Gossett v. Commissioner, 59 Fed. (2d) 365. It is entirely consistent with a purpose to liquidate that the corporation and its management should continue the operation of the business as long

---

[10]It should be noted at this point that the commissioner of taxation has never challenged taxpayer's contention that prior to the termination of the agreement between Hartford and Northwestern the portfolio of securities was held by Northwestern as an asset necessary to the conduct of its business, i. e., to back policy losses. Moreover, nothing in the record indicates that this was not the case. Due to this fact, decisions such as Estate of Chandler v. Commr. of Int. Rev. 22 T. C. 1158, are to be distinguished. In the Chandler case the tax court properly tested dividend equivalence by viewing the past dividend policy of the distributing corporation and the size of its corporate surplus. Partial-liquidation treatment was denied because the distribution, at least in part, was made (22 T. C. 1167) "from an accumulation of earnings beyond the needs of the business." It did not arise from and reflect a contraction of business. In the instant case the assets distributed were vital to the business which had been carried on.

[11]Under Northwestern's termination agreement with Hartford, Hartford assumed liability on the insurance contracts Northwestern had in force.

as there was a reasonable justification for their judgment that this was the wisest course."

In Northwestern's case the merger with Guaranty and continuance in the insurance business was not merely "the wisest course." It was the only alternative given it by the commissioner of insurance. If it were left solely to Northwestern, the insurance business would have been discontinued entirely. As a result of the commissioner's opposition to complete liquidation, it could only reduce assets to $750,000 and continue operations by merging with Guaranty. Though it continued to exist as a corporate entity, Northwestern was operated by Guaranty's management and personnel, backed by Guaranty's assets, and carried on under Guaranty's name. Such circumstances reasonably support the board's finding that Northwestern underwent a genuine contraction.

Minn. St. 290.135, subd. 4(a)(2), also requires that the distribution be "in redemption of a part of the stock of the corporation." The board found this requisite to have been fulfilled when Northwestern reduced the par value of its stock from $10 to $5 on June 12, 1959. This finding is challenged by the commissioner on the ground that subd. 4(a)(2) envisions a redemption of part of the corporation's *shares of stock*—a result not accomplished by a reduction in par value, which simply reduces the corporation's capital liability to its shareholders without altering the number of shares outstanding. Thus, the issue squarely presented is whether a "redemption" under subd. 4(a)(2) may be made by reduction in par value.

Proposed Treasury Regulation § 1.317-2, 19 Fed. Reg. 8254, stated that under the 1954 Internal Revenue Code a distribution accompanied by a par-value reduction would constitute a redemption. However, this was omitted from the final regulations. The legislative history of the 1954 code is equally unhelpful. The House bill, H. F. 8300, 83d Cong., 1st Sess., approved such a "redemption." The Senate Committee on Finance deleted the provision, but stated (S. Rep. No. 1622, 83d Cong. 2d Sess. p. 252) that "[n]o inference is to be drawn by the elimination of this provision * * * as to the status of existing law

in this area." Professor Bittker, in *The Taxation of Stock Redemptions and Partial Liquidations,* 44 Cornell L. Q. 299, 310, states flatly:

"* * * Such a distribution [accompanied by a reduction in par value] was not equivalent to a redemption under the 1939 Code [citing Sheehan v. Dana (8 Cir.) 163 F. (2d) 316, and Beretta v. Commr. of Int. Rev. 1 T. C. 86, affirmed (5 Cir.) 141 F. (2d) 452, certiorari denied, 323 U. S. 720, 65 S. Ct. 50, 89 L. ed. 579], and nothing in the 1954 Code suggests that a different rule should be applied in the future."

But the case law indicates that the matter is not free from doubt.

The Beretta case held that a reduction in par value did not constitute "redemption of a part of [the corporation's] stock" under the first clause of § 115(i) of the 1939 code.[12] This decision was based upon the almost identical holding in Wilcox v. Commr. of Int. Rev. 43 B. T. A. 931, affirmed (9 Cir.) 137 F. (2d) 136, which stated a par-value reduction was not in "redemption of all or a portion of [the corporation's] stock" under the second clause of § 115(i). Both decisions were followed in Long v. Commr. of Int. Rev. 5 T. C. 327, affirmed (6 Cir.) 155 F. (2d) 847; Sheehan v. Dana (8 Cir.) 163 F. (2d) 316; Avco Mfg. Corp. v. Commr. of Int. Rev. 25 T. C. 975; and Miller v. Commr. of Int. Rev. 26 T. C. 115. At first glance these cases appear dispositive of the instant controversy in the commissioner's favor. But in R. D. Merrill Co. v. Commr. of Int. Rev. 4 T. C. 955, 967, it is pointed out:

"* * * This Court in the Beretta case, *supra,* at [1 T. C.] page 94, was careful to point out that if it could be said that 'the complete liquidation of the company' was under way or that the distribution in question was 'one of a series of distributions to be made in the complete liquidation of the company,' 'then the fact that none of the corporation's shares were canceled and retired as a result of the distribution would not be material and the method used of reducing the par value of the stock * * * would be sufficient and the cases of Bynum v.

---

[12]53 Stat. 48.

Commissioner [citation omitted], and Commissioner v. Straub [citation omitted], affirming 29 B. T. A. 216, * * * would be in point * * *.' "[13]

In Straub v. Commr. of Int. Rev. 29 B. T. A. 216, affirmed sub nom. Commr. of Int. Rev. v. Straub (3 Cir.) 76 F. (2d) 388, and Bynum v. Commr. of Int. Rev. 40 B. T. A. 336, reversed (5 Cir.) 113 F. (2d) 1, the distributions in question were made while the corporations were in the process of complete liquidation although they were not completely liquidated by the distributions. In the Straub case it was held that a distribution of $450 per share was in partial liquidation and the requirement of a "redemption" was fulfilled by a reduction in par from $500 to $50 (29 B. T. A. 220) "notwithstanding the fact that the method was that of reducing the face value of each outstanding share and not that of reducing the number of outstanding shares." In the Bynum case par value was not even reduced. There was only a presentation of stock certificates and a notation thereon that a liquidating dividend was paid. The court found a partial liquidation, saying (113 F. [2d] 3):

"* * * The endorsement of the liquidating dividends on the stock certificates canceled and redeemed them to that extent."[14]

From the foregoing it is clear that the courts have applied two distinct rules with regard to "redemptions" in partial liquidations. If the distribution is not made while the corporation is in the process of complete liquidation, a reduction in par value will not suffice. There must be a reduction in the number of shares of stock outstanding, not just in the corporation's capital liability. But if the corporation is in the

---

[13]See Wilcox v. Commr. of Int. Rev. 43 B. T. A. 931, 939, in which it was said: "The question is whether the last clause of [§ 115(i)] should be interpreted to mean 'or one of a series of distributions in complete cancellation or redemption of all or a portion of its [shares of] stock.' We think that this was the intendment of Congress in enacting the provisions, *except in a case where a corporation is in liquidation and the distribution made pro rata to the stockholders is one of a series of distributions in complete liquidation of the corporation.*" (Italics supplied.)

[14]Cf. Fowler Hosiery Co. v. Commr. of Int. Rev. (7 Cir.) 301 F. (2d) 394.

midst of complete liquidation, redemption may be by reduction in par value. The question therefore arises: In which category does the present case fall?

It does not clearly fall into either category. Like the corporations in the cases applying the Beretta rule, Northwestern did not completely liquidate. It merged with Guaranty and even now is engaged in the insurance business. On the other hand, like the corporations in the Straub and Bynum cases, the taxpayer at the time of the $50-per-share distribution hoped to carry out its plan of complete liquidation of Northwestern. A notice of a special meeting of the taxpayer's stockholders indicates that as early as July 14, 1958, when it was only a minority shareholder in Northwestern, the intent was to completely liquidate Northwestern. However, difficulty arose when the commissioner of insurance objected to the complete liquidation of Northwestern and on January 5, 1959, the directors of Great Northern adopted the alternative plan, outlined earlier, either to completely liquidate Northwestern or simply to reduce its worth. The board found that:

"* * * Whatever the merit of the position of the Commissioner of Insurance, the [taxpayer] did not wish to become involved in a lawsuit and attempted to 'work out a scheme which would be acceptable to him' * * *."

By the second alternative of the plan Northwestern would remain in existence and thus accommodate the commissioner of insurance.[15]

But plans to liquidate completely were not abandoned. Several attempts were made to prevail upon the commissioner of insurance to

---

[15]It was in accordance with this alternative that the taxpayer submitted the plan to the commissioner of internal revenue whereby Northwestern would reduce its net worth to $100,000 through distributions to its shareholders in redemption of 95 percent of the shares of stock outstanding. Great Northern was then to sell its remaining shares to "Interested Purchasers." The commissioner of internal revenue ruled this transaction would constitute a partial but not a complete liquidation. Ultimately Great Northern was unable to find a purchaser for its stock and hence arranged as a third alternative the merger between Northwestern and Guaranty.

withdraw his objection. Mr. Anderson, president of both the taxpayer and Northwestern (prior to the merger), testified:

"* * * [F]rom the very beginning once we had our meeting on January 5th, my whole objective was * * * to bring release funds at the earliest possible date and bring them through so the complete liquidation could ultimately take place of both companies * * *."

Even after the distribution of $50 per share on April 13, 1959, it was suggested by a notice of a special meeting of stockholders of Great Northern, dated May 25, 1959, that, although complete liquidation of Northwestern "is currently not feasible because of objections raised by the Minnesota Commissioner of Insurance," the commissioner might still change his position, in which case Northwestern would completely liquidate rather than merge with Guaranty. In short, until finalization of the merger with Guaranty the hope had been to liquidate Northwestern completely and everything possible was done to effect this result. It was because of the commissioner's objections that the $50-per-share distribution was made pursuant to the alternative method envisioned in the plan of January 5, 1959, rather than pursuant to the more simple plan of complete liquidation, and it was because of his objections that complete liquidation was not ultimately carried out.

In view of these circumstances it seems only just to apply to the instant case the rule of Straub v. Commr. of Int. Rev. *supra,* which held that a reduction in par value constitutes a redemption when made in furtherance of a plan to completely liquidate the corporation. This was the ruling made in Rev. Rul. 59-240, Int. Rev. Bull. 1959-2, C. B. 112, 113, on facts very similar to those herein. There the corporation adopted a plan of complete liquidation and made a distribution contemplated as one of a series which would completely liquidate the corporation. At the time of the distribution each outstanding share of capital stock was surrendered for one no-par share, and the new stock certificates were stamped with the notation that a liquidating dividend had been paid. Subsequently it was decided to discontinue complete liquidation. The ruling was that "the initial distribution is held to qualify as a distribution in partial liquidation under section 346(a)(2) of the code."

The commissioner of taxation has asserted that—

"* * * the $50.00 distribution had absolutely nothing to do with the reduction in par value. The consideration received by the stockholders for accepting the reduction in capital liability were the distributions of June 18, 1959 and July 11, 1959. Only these distributions resulted from and depended upon the $5.00 reduction in par value of the stock in Northwestern * * *."

However, the board found:

"* * * This reduction of the par value * * * from $10 to $5 was incidental to and a part of the general plan adopted on January 5, 1959."

This finding is reasonably supported by the evidence and thus cannot be arbitrarily overturned. Under the plan of January 5 several distributions were to be made which, in the alternative, would either completely liquidate Northwestern or simply reduce its net worth. Under either procedure the distributions would impair capital if capital was was not reduced. The par-value reduction prevented such impairment and was necessitated by and tied to the several distributions. It would be ignoring the overall transaction to hold that "the $50.00 distribution had absolutely nothing to do with the reduction in par value."

On the basis of the foregoing rulings and authorities, and because it appears that Northwestern in good faith made the distribution of $50 per share while in the process of liquidation, the board's finding that there was a "redemption" of stock under Minn. St. 290.135, subd. 4(a)(2), is affirmed. In accordance with Rev. Rul. 56-513, Int. Rev. Bull. 1956-2, C. B. 191, 192, followed in Rev. Rul. 59-240, Int. Rev. Bull. 1959-2, C. B. 112—

"* * * regardless of the actual number of shares surrendered for redemption by the stockholders, the total number of shares deemed to have been surrendered is that number which bears the same ratio to the total number of shares outstanding as the cash distributed bears to the total fair market value of the net assets of the corporation immediately prior to the distribution."

The requirements of § 290.135, subd. 4(a)(2), having been satisfied,

the distribution is treated "as in part or full payment in exchange for the stock" under § 290.134, subd. 1(a)(2), and Great Northern need not recognize the gain thereon, having adopted a 12-month liquidation plan pursuant to § 290.135, subd. 2.

Affirmed.

MR. JUSTICE SHERAN, having been a member of the Board of Tax Appeals at the time this case was decided by it, took no part in the consideration or decision of this appeal.