MIDWESTERN PRESS, INC. v.
COMMISSIONER OF TAXATION.

203 N. W. 2d 344.

December 1, 1972—No. 43341.

*Warren Spannaus,* Attorney General, and *Paul B. Saltzman,* Special Assistant Attorney General, for relator.

*Felhaber, Larson, Fenlon & Vogt, Edward J. Bohrer,* and *Daniel R. Wachtler,* for respondent.

KNUTSON, CHIEF JUSTICE.

Certiorari to review a decision of the Tax Court which reversed a determination of the commissioner of taxation and held that respondent, Midwestern Press, Inc., was entitled to exemption from the sales tax on its purchases of lithographic plates.

Midwestern Press, Inc. (hereinafter referred to as Midwestern) is a Minnesota corporation engaged in the business of commercial printing, a major portion of which is done by the "offset" method of lithography, which utilizes in its printing process metal lithographic plates. Offset lithography is done on a three-cylinder press. A lithographic plate is "hung" on the first roller; the image is transferred from the plate to a second roller (the blanket cylinder) and transferred from that to the paper which is fed by a third roller.

In the ordinary course of business during the period in question, the taxpayer's printing jobs started with placement of an order with one of its salesmen. Midwestern would then obtain the necessary specifications from its customer and order the appropriate metal printing plate from Mankato Graphic Arts, a plate manufacturer. Mankato Graphic Arts would manufacture and sell taxpayer the finished lithographic plate, ready to be used in the printing process.

The plates themselves are extremely thin sheets of aluminum ranging from 10/ to 12/1,000 inch thick. They are easily ruined by oxidation. Moisture and handling can lead to this oxidation,

which will cause the plate to print a smear of black scum on the paper. Due to this problem and because of the rush nature of the business, the plates are usually ordered not over a week before printing. Other damage to a plate can occur during printing. If the plates are left unprotected on the press for 15 to 20 minutes, they are likely to oxidize. Wear from the printing itself will damage the plates. They are rated by their manufacturer as capable of making from 25,000 to 30,000 impressions and they may wear out even before making 25,000 impressions. When they do wear out due to use, a new plate must be procured to finish the printing job. Due to the nature of the plates, it is impossible to make any alterations requiring the addition of new material, although it is possible to eliminate some of the material on the plates. For these reasons, the plates are usually good for only the specific job for which they are made. Midwestern's customary procedure after an order was run was to stack the plates in its basement and sell them as scrap. It was possible to try to preserve them for use on reorders for the same printing job, but this was seldom done. The record shows that out of 160 jobs in the time period here involved the plates were used for reruns only three times.

Midwestern failed to pay a sales tax on the purchase of lithographic printing plates during the period of August 1, 1967, to March 31, 1968. Instead, Midwestern furnished a tax-exemption certificate to the manufacturer of the plates. The charge to Midwestern's customers for the finished printing job lists the cost of the plates, ink, and paper as a separate "outside" charge at cost. Midwestern's customer was then charged sales tax on the total bill, including the "outside" charges.

The commissioner of taxation rejected taxpayer's claim to exemption. The commissioner's order was reviewed by the Tax Court, which held that the plates were exempt from payment of the sales tax.

The case involves the exemption provided by Minn. St. 297A.25, subd. 1(h), which in material part reads:

"The gross receipts from the sale of and the storage, use, or consumption of all materials, including chemicals, fuels, petroleum products, lubricants, packaging materials, feeds, seeds, fertilizers, electricity, gas and steam, *used or consumed* in * * * industrial production of personal property intended to be sold ultimately at retail, whether or not the item so used becomes an ingredient or constituent part of the property produced. * * * Machinery, equipment, implements, tools, accessories, appliances, contrivances, furniture and fixtures used in such production and fuel, electricity, gas or steam used for space heating or lighting, are not included within this exemption." (Italics supplied.)

The commissioner contends: First, that the language "used or consumed" should be construed to mean "used and consumed"; and second, that the lithographic plates involved are within the provision that machinery used in production is not included within the exemption.

The Tax Court held that "[l]ithographic printing plates' are specifically made for particular jobs and except in isolated cases are not reuseable. In any event they are not useable beyond certain capacities because of wear and abrasion on the plate." The Tax Court further held:

"It is the opinion of this Court that the lithographic plates in question here are used *and* consumed in the printing process. This Court sees no distinction between the plates and the ink used in the printing process. Each is a part of the materials necessary to produce the finished product on the paper. Once the ink is used to produce the finished product it cannot be reused. Similarly once the plate has been used, except in isolated cases, it cannot be used again. This clearly distinguishes the lithographic plates in question from other materials used in certain manufacturing processes such as sand in sand-molding, which can be reused again for other molds.

"It is the opinion of this Court that the term 'consumed' as used in our statute does not necessarily mean physical consumption but is broad enough to include economic consumption of the

subject property. It is the opinion of this Court that the lithographic plates are 'economically consumed' in the printing process, having only junk value at the end of their run." (Italics supplied.)

Our attention has been called to a number of cases from foreign jurisdictions allegedly supporting the positions of the respective parties. We see no useful purpose in attempting to reconcile these cases with, or distinguish them from, the facts now before us. In many of them, the statutes are not the same as ours; in others, the facts are distinguishable. No case has been called to our attention identical to the case before us on both statute and facts.

The commissioner relies on cases such as Bonnar-Vawter, Inc. v. Johnson, 157 Maine 380, 173 A. 2d 141 (1961). That case did involve offset printing plates, but they were brass and rubber plates of a far more durable type than the aluminum plates involved here. As the court pointed out in Bonnar-Vawter, about 30 percent of the plates were used again with slight alterations, about 30 percent were reused with major alterations, about 5 percent were reused with no alterations, and only 34 percent of the plates were never reused. Contrasted with those facts are the facts in the present case, where the plates were seldom, if ever, used for a rerun and, even when they were, had to be carefully preserved but would still last for only a comparatively short time. No alterations could be made, except that some part of the composite could be eliminated; nothing could be added. The plates were good for only a limited run, and if a plate became unusable before the finish of the run, a new plate had to be procured and the old one was completely useless except for scrap.

The Tax Court held that the plates were as much consumed in the process of printing a job as the ink which was applied to the rollers. There is much merit in this contention. The commissioner argues that the ink became a part of the finished product, whereas the plate did not, but the answer to this is that probably

much of the ink applied to the rollers neither became part of the finished product nor could it be used again.

While the Tax Court coined the phrase "economic consumption," we are convinced that it was right in holding that these lithographic plates, which are manufactured and used only for the job for which they are prepared and are worthless after the job is completed, except in the rare cases where there is a rerun, are, for all practical purposes, consumed in completing the job.

The commissioner's main contention is that once the plates were attached to the printing press they became part of the "machinery" and therefore were excluded from the exemption provided by the statute. This contention might be tenable if the plates were usable for more than the one job for which they were ordered.

We are unable at this time to set out any comprehensive test for distinguishing "materials" from "machinery, equipment, implements," etc. On the facts of this case, however, we hold that lithographic plates which are custom-made for a particular job run, are usable for only a limited number of impressions, and have value only as scrap at the conclusion of the run are not machinery within the meaning of subd. 1(h).

The commissioner further argues that exemptions are to be strictly construed and that administrative interpretations should be given considerable weight. While we agree with both propositions in general terms, it is our function to try to apply to the statute such meaning as will encompass the legislative intent in so far as we can ascertain what that is. It is also the applicable law that the decisions of the Tax Court are to be sustained if reasonably supported by the evidence. We are convinced that the Tax Court was right and its decision should be and is affirmed.

Affirmed.

MR. JUSTICE OTIS and MR. JUSTICE TODD took no part in the consideration or decision of this case.