## UNITED STATES STEEL CORPORATION v. COMMISSIONER OF TAXATION.

226 N. W. 2d 870.

February 21, 1975—No. 44766.

*Hanft, Fride, O'Brien & Harries* and *Tyrone P. Bujold,* for relator.

*Warren Spannaus,* Attorney General, *C. H. Luther,* Deputy Attorney General, and *Arthur J. Glassman,* Special Assistant Attorney General, for respondent.

Heard before Otis, Kelly, Todd, Yetka, and Knutson, JJ., and considered and decided by the court en banc.

KNUTSON, JUSTICE.*

This case involves a review by certiorari of a decision of the Minnesota Tax Court, holding that relator, United States Steel Corporation, is subject to a sales or use tax on certain purchases made between August 1, 1967, and December 31, 1968, and on the rental of certain property during the same period under leases entered into prior to the enactment of the Minnesota sales and use tax, but for which payments were made after the enactment of such tax.

The statute involved is Minn. St. 1971, § 297A.25, subd. 1(h), which at all times relevant to this action read:

"Subdivision 1. The following are specifically exempted from the taxes imposed by sections 297A.01 to 297A.44:

\* \* \* \* \*

"(h) The gross receipts from the sale of and the storage, use, or consumption of all materials, including chemicals, fuels, petroleum products, lubricants, packaging materials, feeds, seeds, fertilizers, electricity, gas and steam, used or consumed in agricultural or *industrial production* of personal property in-

---

* Retired Chief Justice acting pursuant to Minn. St. 2.724.

tended to be sold ultimately at retail, whether or not the item so used becomes an ingredient or constituent part of the property produced. Such production shall include, but is not limited to, production of any tangible personal property, manufacturing, processing (other than by restaurants and consumers) of agricultural products whether vegetable or animal, commercial fishing, refining, smelting, reducing, brewing, distilling, printing, mining, quarrying, lumbering, generating electricty and road building. Such production shall not include painting, cleaning, repairing or similar processing of property except as part of the original manufacturing process. Machinery, equipment, implements, tools, accessories, appliances, contrivances, furniture and fixtures used in such production and fuel, electricity, gas or steam used for space heating or lighting, are not included within this exemption." (Italics supplied.)

The facts were stipulated. Relator is engaged in the business of mining iron ore and manufacturing steel, cement, and related products for sale. It is stipulated that the business operations of relator constitute "industrial production" within the meaning of the statute. During the period involved, relator purchased certain items and used them in the course of manufacturing steel at its "Duluth Works" in Duluth, Minnesota, and in the course of manufacturing cement in its "Universal Atlas Cement Plant" in Duluth, and in the course of mining iron ore on the Mesabi Range. The stipulation is quite lengthy and may be summarized so as to divide the various items into categories as follows:

A. Operating Supplies:
1. Items immediately and totally consumed in operations:
    (a) Jet tappers used to tap open-hearth furnaces (one use) ;
    (b) Oxygen and acetylene used in maintenance welding on railroad cars, locomotives and shovels;
    (c) Short shanks for a "Leroy auger" used to tap blast furnaces (one use).

2. Material used in extracting, shaping, treating, or conditioning the property to be sold at retail:

   (a) Grinding balls used in a rotating grinding drum for the purpose of crushing "clinkers" in the manufacture of cement (useful life: 1 week);

   (b) Grinding wheels used in conditioning steel billets (useful life: 15 hours for a 16″ wheel);

   (c) Metal screen cloth used for washing and sizing iron ore (useful life: 8 weeks);

   (d) Drill bits used in drilling blast holes in rock (useful life: 130 hours for a tungsten bit);

   (e) Shovel teeth and adaptors used on a shovel bucket for the purpose of digging rock and ore (useful life: teeth —36 hours; adaptors—720 hours).

3. Equipment and electrical supplies:

   (a) Nuts, bolts, cotter pins, rivets, and bushings used to maintain and repair equipment used in mining and manufacturing operations (average quantity used per month: 10,626; average price: 24¢);

   (b) Fuses, clamps, batteries, terminal lugs and switches used in maintenance of product processing electrical equipment (average quantity used per month: 5,514; average price: 26¢);

   (c) Blasting mats made of scrap rubber tires cut in strips and wired together and used to confine debris from blast (useful life: 5 blasts, average quantity used per month: 24; average price: $277.21);

   (d) Oil and air filters, wiper blades, and bulbs used to maintain trucks and other mobile equipment used in the movement of products (average quantity used per month: 1,042; average price: $2.99);

   (e) Fasteners, controls, nuts, bolts, gaskets, and washers used to maintain trucks and other mobile equipment used in the movement of ore and other material in the

mining operation (average quantity used per month: 7,043; average price: 77¢).

4. Materials used in extracting and moving the product during manufacturing:

   (a) Drill and shovel cable used in transmitting electrical and mechanical power within drills and shovels used in mining ore;

   (b) Conveyor belting used to transmit iron ore within the processing plant.

5. Tires and tubes, custom-manufactured for off-the-road use on vehicles used to move materials at the ore mines (useful life: 4,000 to 6,000 hours).

B. "Refractory materials" used in lining heating furnaces:

1. Fire clay and silica brick for lining open-hearth furnaces (useful life: 300 heats/3 months);

2. Fire clay ladle brick for lining open-hearth ladle (useful life: 14-19 heats/1 week);

3. Fire clay ladle brick for lining open-hearth ladle lip (useful life: 10 days).

C. Ingot molds and stools—box-like containers used to shape the molten steel into ingots (useful life: 80 pours).

D. Operating Maintenance Materials:

1. Duluth Works:

   (a) Mobile equipment maintenance materials—small replacement parts for the engines and other component systems of process-tractors, diesels and forklift trucks (average quantity used per month: 234; average price: $8.24);

   (b) Electrical maintenance material—small replacement parts for approximately 120,000 electrical motors used in product processing (average quantity used per month: 10,530; average price: 96¢);

   (c) Operating equipment maintenance material—small replacement parts for pieces of machinery used to move

products through the plant (average quantity used per month: 55,562; average price: 95¢).

2. Ore Operations:
    (a) Mine equipment maintenance material—small replacement parts used for production trucks, shovels, locomotives, tractors, graders, and stripping cars (average quantity used per month: 15,159; average price: $7.24);
    (b) Concentrator maintenance material—small replacement parts for plant product processing equipment such as pumps, concentrators, and washing equipment (average quantity used per month: 9,277; average price: $3.75).

It is the contention of relator that the items mentioned above were used or consumed in industrial production of personal property intended to be sold ultimately at retail and, therefore, are exempt from our sales or use tax. The commissioner, on the other hand, contends that the items involved are "machinery, equipment, implements, tools, accessories, appliances, contrivances" used in such production and, therefore, excluded from the statutory exemption.

The Tax Court held that the items in question, with the sole exception of the jet tappers and short shanks for "Leroy augers," were within the exception to the exemption and taxable. No party has sought review of the decision that the jet tappers and short shanks for Leroy augers were exempt. So, we need not pay any further attention to those items.

At the outset, we are confronted with the rule that this court will not substitute its judgment for that of the Tax Court as to questions of fact. See, Abex Corp. v. Commr. of Taxation, 295 Minn. 445, 207 N. W. 2d 37 (1973); Mankato Citizens Tel. Co. v. Commr. of Taxation, 275 Minn. 107, 145 N. W. 2d 313 (1966); Oliver Iron Min. Co. v. Commr. of Taxation, 247 Minn. 6, 76 N. W. 2d 107 (1956).

Respondent suggests that we adopt the rule of Northwestern Fire & Marine Ins. Co. v. Connecticut Fire Ins. Co. 105 Minn. 483, 487, 117 N. W. 825, 826 (1908) where we said that the presumption in favor of the findings of fact of a trial court applies:

"* * * not only in determining the disputed questions of fact, but in drawing reasonable inferences from undisputed facts."

It is doubtful that this rule has any application where, in determining the items in question were "machinery, equipment, implements, tools, accessories, appliances or contrivances," the Tax Court was applying a statutory interpretation to stipulated facts to determine the ultimate facts. Great Northwestern Investments v. Commr. of Taxation, 267 Minn. 447, 127 N. W. 2d 444 (1964).

The case hangs largely on our decisions in Midwestern Press, Inc. v. Commr. of Taxation, 295 Minn. 59, 203 N. W. 2d 344 (1972), and Jaspersen v. Commr. of Taxation, 300 Minn. 131, 218 N. W. 2d 463 (1974). In Midwestern Press, we affirmed the Tax Court and held that lithographic plates, used to print copy for a commercial printing customer, were exempt from taxation under the above statute. The commissioner in that case argued that the plates were part of the machinery used in the process of printing because they were attached to the printing press. The evidence established that the plates were used only for a particular job for which they were manufactured and were not reusable, partially because they were extremely fragile and subject to destruction by oxidation, and partially because no other customer would wish to have the same material printed. Their only possible reuse was to run additional copies of the material of the original customer and that possibility was limited by the fact that their contents could not be altered and that they could only be preserved for a short period of time. In affirming, we said:

"The commissioner's main contention is that once the plates were attached to the printing press they became part of the 'machinery' and therefore were excluded from the exemption

provided by the statute. This contention might be tenable if the plates were usable for more than the one job for which they were ordered.

"We are unable at this time to set out any comprehensive test for distinguishing 'materials' from 'machinery, equipment, implements,' etc. On the facts of this case, however, we hold that lithographic plates which are custom-made for a particular job run, are usable for only a limited number of impressions, and have value only as scrap at the conclusion of the run are not machinery within the meaning of subd. 1(h)." 295 Minn. 64, 203 N. W. 2d 347.

Jaspersen was decided by this court after the decision of the Tax Court in the case now before us and apparently after relator's brief was written. The commissioner's brief and relator's reply brief were, however, written in the light of the Jaspersen decision, which also was cited during the oral argument of this case. The commissioner contends that Jaspersen is controlling here.

In Jaspersen, the items involved were "polishers, cheeks, and rings," small items which were attached to a large machine for the purpose of polishing, shaping, and finishing drainage tile. The parts had useful lives of only days or weeks and were thereafter replaced. The polishers, cheeks, and rings were used to replace parts which had worn out during the production process, just as are many of the items involved in the case now before us. In affirming the Tax Court which held that the items were not exempt from sales and use taxes, we said:

"* * * The claim of relator that the polishers, cheeks, and rings were used only for the job for which they were prepared and then discarded upon completion of the job was rejected by the Tax Court when it stated that one set of polishers, cheeks, and rings would make a substantial amount of tile which could be sold to several different consumers. The record amply supports that conclusion, and we accept it as a fact. Furthermore,

the fact that the parts involved were rendered worthless in a relatively short time is not determinative of their exemption status under the statute as written at the time of these purchases. In Midwestern, the lithographic plates were consumed rapidly. However, the thrust of the Midwestern decision was the limited and nonrepetitive function of the plates rather than their useful life. In that case, we placed considerable emphasis on the fact that the lithographic plates were specially produced to do a specific job for a specific customer and were worthless after that job was completed. In this case, the polishers, cheeks, and rings, while rendered useless in a short time, can be used to make a large number of field tile which can be sold to several different consumers." 300 Minn. 136, 218 N. W. 2d 466.

Relator contends, among other things, that the Tax Court applied an erroneous ruling of law in construing the statute to exempt only those items directly used and immediately and totally consumed in the process of production. It may be that the Tax Court did believe this to be the proper construction of the exemption, but we need not place decision on that conclusion in the light of Jaspersen. Unless we are to overrule Jaspersen, which we decline to do, the decision of the Tax Court in the case now before us is correct. There is a vital difference between the Midwestern Press case and the Jaspersen case in that in the one, the lithographic plates were manufactured and used for a single job, whereas in Jaspersen, the parts involved were used to manufacture tile that would be sold to a number of purchasers. The same is true of the items involved in this case. The steel and ore to produce it and the cement manufactured by relator were sold generally to any number of purchasers. We see no difference between the items involved in the case now before us and Jaspersen except as to quantity.

Much has been said about foreign decisions, but, as we pointed out in the Midwestern Press case, little can be accomplished by trying to reconcile these cases with our own. Most of these for-

eign cases were considered in our former decisions. Seldom will the statutes be the same or the facts identical. We prefer to follow our own decisions rather than to try to follow foreign decisions pro or con such decisions. We are convinced that the case is controlled by Midwestern Press and Jaspersen and must fall within one or the other. We are convinced, as we have said above, that Jaspersen controls.

Relator seeks to take advantage of an amendment of the statute in 1973 which reads, in part:

"* * * Machinery, equipment, implements, tools, accessories, appliances, contrivances, furniture and fixtures, used in such production and fuel, electricity, gas or steam used for space heating or lighting, are not included within this exemption; however, accessory tools, equipment and other short lived items, which are separate detachable units used in producing a direct effect upon the product, where such items have an ordinary useful life of less than 12 months, are included within the exemption provided herein." L. 1973, c. 650, art. XIII, § 2.

Relator argues that the amendment was not intended to change the statute but simply to clarify it. The legislative history of the act does not support relator. When the bill was originally introduced, the proposed amendment to the section in question read, in part:

"* * * The terms of the preceding sentence [the exception to the exemption] shall include the basic machine itself and all of its component parts, such as belts, pulleys, shafts, moving parts and operating structures as well as any accessory tools or equipment such as litho plates and other short lived items which are separate detachable units used in producing a direct effect upon the product, and shall further include equipment or devices used to control, regulate or operate the machine." House File 2121, art. V, § 1.

That language remained in the bill, despite attempts to amend it throughout the process of committee hearings and floor con-

sideration in both houses. In the House of Representatives, Representative Salisbury Adams sought to amend the bill by striking from the above-quoted sentence the phrase referring to accessory tools and short-lived items. Journal of the House, 1973, p. 2743. Senator Mel Frederick moved to amend the bill by striking all of the sentence and inserting the following language in its place:

"* * * but shall not include any accessory tools or equipment such as litho plates and other short lived items which are separate detachable units used in producing a direct effect upon the product." Journal of the Senate, 1973, p. 2778.

Both amendments failed.

When the bill returned from conference committee, the language in the section was the language finally enacted. The distinction between items having useful lives of more than 12 or less than 12 months appeared for the first time in the conference committee report. Journal of the House, 1973, p. 3838. This legislative history indicates that the original language of the bill sought to change rather than clarify the prior language. By the specific reference to litho plates the bill sought to legislatively overrule the Midwestern Press case. The suggested floor amendments, which failed by close votes, would either have left the language in its earlier form or made one slight change in it. That does not suggest a unified effort to clarify the statute. Thus, the language finally adopted, particularly the 12-month provision, was probably a compromise between the language in the bill as introduced, which would have imposed a much heavier tax liability on industry than was previously the case, and the position taken in the floor amendments which either would have left the old language in effect or would have specifically exempted what the new bill sought to include. The numerous versions of the language and the disagreement as to what should be exempt are not indicative of a legislative attempt to clarify what it had always intended to say but are instead symptoms that the various legislators disagreed, just as the business community and the com-

missioner of revenue do, on the ultimate policy question of what items should be exempt. Thus, the final language should be viewed as a change and not a clarifying amendment.

The only question that remains is that pertaining to the lease of certain equipment.

The parties stipulated that the subject matter of the leases involved here is administrative and production equipment; that the rental payments in question were made pursuant to leases executed and in effect prior to August 1, 1967, the effective date of the Minnesota sales and use tax; that possession of the equipment was transferred prior to August 1, 1967; and that the term of the rental periods under the leases varies from 1 to 12 months.

Three leases are involved. The first, dated November 2, 1966, is of a Euclid truck. The lease was for a term of 5 months and granted relator an option to renew the lease for an additional 5-month period or to purchase the vehicle. Payments were apparently made over a period from June 14, 1967, to July 1968. The second lease, entered into in early 1967, was of a Mack truck. Instead of establishing a fixed term, the lease provided that relator would operate the vehicle for a total of 3,000 hours, with a minimum of 400 hours per month, at a fixed, hourly rental rate. Relator apparently began using the vehicle in February 1967 and continued to do so until October 1968. The third lease involved the rental from Xerox Corporation of a number of copying machines. The lease was entered into in March 1967 and had no fixed term but was from month to month until notice of cancellation. Both parties rely, in part, on Hansord Agency, Inc. v. Commr. of Taxation, 294 Minn. 198, 199 N. W. 2d 823 (1972). In that case motor vehicles were leased to the taxpayer prior to the effective date of the sales and use tax and the commissioner sought to tax payments made after the effective date of such tax. We held that inasmuch as the taxpayer was irrevocably bound to make the payments during a fixed term, which continued after the effective date of the sales and use tax, the payments were not taxable. We said:

"\* \* \* The fact remains that the rights of the lessor and lessee were irrevocably fixed at the time the lease was entered. The lessee had an unconditional obligation to pay the entire amount of the rental, and the time when the payments were due we regard as irrelevant in the absence of any expression to the contrary by the legislature. The tax is on sales made after July 31, 1967, and a sale is defined as including, among other things, the leasing of tangible personal property. To adopt the Tax Court's argument would require us to hold that a new lease is entered each time an installment is paid, which is not the situation *where there is a written contract for a specific term not revocable by either party.*" (Italics supplied.) 294 Minn. 199, 199 N. W. 2d 824.

We are convinced the Tax Court correctly held here that, where the leases are not irrevocable but may be terminated at will by either party, payments after the effective date of the sales and use tax are not exempt from taxation. See, Crown Iron Works Co. v. Commr. of Taxation, 298 Minn. 213, 214 N. W. 2d 462 (1974). That case did not involve a lease but involved a contract for the future delivery of goods entered into prior to the effective date of the act or delivery was made after the effective date.

Affirmed.

YETKA, JUSTICE (dissenting in part and concurring in part).

I respectfully dissent. It appears clear to me that, under the language of the statute, the materials that are the subject of this appeal were intended to be exempt.

Minn. St. 1971, § 297A.25, subd. 1(h), states as follows:

"Subdivision 1. The following are specifically exempted from the taxes imposed by sections 297A.01 to 297A.44:
\* \* \* \* \*
"(h)   The gross receipts from the sale of and *the storage, use, or consumption of all materials, including chemicals, fuels, petroleum products, lubricants, packaging materials, feeds, seeds, fertilizers, electricity, gas and steam, used or consumed in agri-*

*cultural or industrial production of personal property* intended to be sold ultimately at retail, *whether or not the item so used becomes an ingredient or constituent part of the property produced.* Such production shall include, but is not limited to, production of any tangible personal property, manufacturing, processing (other than by restaurants and consumers) of agricultural products whether vegetable or animal, commercial fishing, refining, smelting, reducing, brewing, distilling, printing, mining, quarrying, lumbering, generating electricity and road building. Such production shall not include painting, cleaning, repairing or similar processing of property except as part of the original manufacturing process. *Machinery, equipment, implements, tools, accessories, appliances, contrivances, furniture and fixtures used in such production and fuel, electricity, gas or steam used for space heating or lighting, are not included within this exemption.*" (Italics supplied.)

While it is true that in the case of Jaspersen v. Commr. of Taxation, 300 Minn. 131, 218 N. W. 2d 463 (1974), this court held that certain polishers, cheeks, and rings attached to a large machine for the purpose of polishing, shaping, and finishing drainage tile were not within the statutory exemption, I think that case should be limited strictly to its facts.

Relator makes what to me is a compelling case that the statute should be interpreted to treat as fixtures or part of the machinery for sales and use tax purposes those items which are treated by the taxpayer and commissioner of revenue as items that may be depreciated for income tax purposes and to treat those items which are current expense items for income tax purposes as exempt from the sales tax.

To hold otherwise means that the commissioner and the Tax Court will be compelled to decide almost every appeal on a case-by-case basis.

No tax is a good tax to one who has to pay it. However, a tax can be made more acceptable and palatable to the taxpayer if the

statute imposing it is clear and precise in its language and interpretation, and is easy to administer.

Adopting as applicable to the sales tax act an interpretation of language, such as "fixture" and "expense," used and defined under the income tax laws since their inception, would enable both the administrator of the act and the taxpayer to know what is meant, and the tax itself would be easier to administer. While the 1973 amendment referred to in the majority opinion will be helpful in the future, it is of little aid for the disputes arising prior to the passage of that act.

I concur in the holding of the majority in regard to the taxability of the rental payments on the leased equipment.

KELLY, JUSTICE (dissenting in part and concurring in part).

I join in the opinion of Mr. Justice Yetka.