**STANDARD PACKAGING CORPORATION,**
Respondent,

v.

**COMMISSIONER OF REVENUE,**
Relator.

No. 49104.

Supreme Court of Minnesota.

Dec. 21, 1979.

Warren Spannaus, Atty. Gen., and James W. Neher, Sp. Asst. Atty. Gen., Dept. of Revenue, St. Paul, for relator.

Briggs & Morgan and John R. Kenefick, St. Paul, for respondent.

OTIS, Justice.

The relator Commissioner of Revenue seeks review of a decision of the Minnesota Tax Court, filed November 14, 1977, holding that the sale to respondent of paintings by artists, and the sale of transparencies by photographers for reproduction by respondent were not subject to a sales tax under Minn.Stat. § 297A.01 (1978).

We affirm.

The facts as set forth in the tax court's findings are not in dispute. Standard Packaging Corporation (hereinafter referred to as "Standard"), a New York corporation, does business in Minnesota as Brown & Bigelow (hereinafter referred to as "B. & B."). B. & B. is engaged in the business of selling advertising specialties. All sales of advertising specialties for use within Minnesota are sales at retail on which B. & B. pays a sales tax to the State of Minnesota. Its product lines include calendars, greeting cards, place mats, and prints. Each of these products generally has artwork reproduced on its face. Pursuant to an audit, the Commissioner of Revenue issued an Order on December 23, 1975, assessing additional sales and use tax against Standard in the total amount of $15,161.48, excluding interest. Standard paid $8,929.98 of the tax assessed which amount is not here in dispute. The disputed amount included in the assessment is a tax on amounts disbursed to (1) painters for the purchase of original paintings and the right to reproduce said paintings, and (2) photographers for the right to reproduce color transparencies. For the purpose of acquiring artwork to reproduce on its products, B. & B. enters into contracts with painters and photographers. All contracts provide that B. & B. may reproduce the illustration on its products.

B. & B.'s method of procuring the artwork varies with the type of artwork pro-

cured. In the instance of paintings and graphics by original artists, B. & B. contracts with the artist to portray a particular theme with given elements. Frequently, B. & B. will prepare a sketch in advance of the proposed artwork. The artist will frequently submit a sketch of a reduced size of the proposed product. Occasionally, the artist will prepare more than one sketch which reflects the assignment given him. B. & B. frequently makes suggestions as to changes such as balance of color and composition. In each instance, the original painting is commissioned by B. & B. and the painter creates the work pursuant to the contract. Most contracts with painters are divisible into two categories: (a) contracts which purport to purchase the original painting and all reproduction rights in return for a lump sum payment; and (b) contracts which purport to purchase the original painting and all reproduction rights in return for a royalty based on a percentage of sales by B. & B.. The reproduction rights acquired under all contracts are copyrighted. Of all types of contracts entered into between B. & B. and painters, B. & B. acquires title to approximately ninety percent of the paintings. Of these paintings B. & B. resells some, returns some upon request, donates some and disposes of others. B. & B. sells paintings from its public gallery. Each purchaser of a painting copyrighted by B. & B. signs an agreement reserving to B. & B. all copyright and reproduction rights. B. & B. enters into a contract annually with Norman Rockwell to create a painting for the annual Boy Scout Calendar. These paintings have significant value. Forty-eight of these paintings have been donated to the Boy Scouts of America; B. & B. retains title to four of them. The Boy Scouts have annually granted a license to B. & B. to use its insignia in its reproductions.

B. & B. also contracts for rights to reproduce color transparencies for use in its products. These rights are acquired only for a lump sum payment. B. & B. does not take title to the transparencies. B. & B. uses approximately 200 transparencies annually on its products. B. & B. examines approximately 20,000 transparencies annually to select the ones which are used in its products. As distinguished from the paintings, B. & B. never commissions a particular theme to be photographed. In each instance when a photographer submits a transparency, B. & B. secures an agreement limiting its liability to $15.00 per transparency. When a transparency is selected, a purchase order is issued. B. & B. only acquires limited reproduction rights to each transparency, e. g., 1976 calendar reproduction rights. The usual variables in acquired rights are the purpose, the year and the country. The rights are purchased for a price frequently between $350.00 and $625.00. In each instance B. & B. returns the transparency to the photographer. B. & B. also secures an assignment of reproduction rights in respect of each transparency from the photographer. These assignments can be recorded with the Register of Copyrights.

In the case of paintings and other opaque artwork, the paintings are photographed four times with different filters each of which filters different colors. This produces four continuous tone negatives, each of which contains only shades of a particular color. These negatives are exposed to a screen positive which separates the continuous tone into small dots. The intensity of the color is variable with the size of the dots. The screen positives are contracted to a proof press plate by a photographic process. The plates make a set of prints which are color corrected as compared to the original work. The plates are then made from the color corrected copy. These plates are used in production of the finished copy. The only variation for transparencies is that the continuous tone color negatives are made from the transparencies by a different process. The processing from them is as described above.

The issues are: (1) Whether the sale with reproduction rights of paintings to B. & B. by artists is a transfer of title of tangible personal property and hence taxable under Minn.Stat. §§ 297A.01, subd. 3(a), .02 (1978); (2) or whether such sales are exempt under

Minn.Stat. § 297A.01, subd. 4 (1978), as sales for a purpose other than resale in the regular course of business; (3) or exempt under Minn.Stat. § 297A.25, subd. 1(h) (1978), as a sale of materials used or consumed in industrial production of personal property intended to be sold ultimately at retail; and (4) whether the contracts to reproduce transparencies furnished B. & B. by photographers are taxable under Minn. Stat. § 297A.01, subd. 3(a), .02 (1978) as licenses to use tangible personal property, or are exempt under Minn.Stat. § 297A.01, subd. (4) (1978) or Minn.Stat. § 297A.25, subd. 1(h) (1978).

The applicable statutes, insofar as they are pertinent, provide as follows:

[Minn.Stat. §] 297A.01 [(1978).] Definitions. Subdivision 1. The following words, terms, and phrases when used in sections 297A.01 to 297A.44 shall have the meanings ascribed to them in this section except where the context clearly indicates a different meaning.

\* \* \* \* \*

Subd. 3. A "sale" and a "purchase" includes, but is not limited to, each of the following transactions:

(a) Any transfer of title or possession, or both, of tangible personal property, whether absolutely or conditionally, and the leasing of or the granting of a license to use or consume tangible personal property, for a consideration in money or by exchange or barter \* \* \*.

Subd. 4. A "retail sale" or "sale at retail" means a sale for any purpose other than resale in the regular course of business.

[Minn.Stat. §] 297A.02 [(1978).] Imposition of tax. \* \* \* [T]here is hereby imposed an excise tax of four percent of the gross receipts from sales at retail, as hereinbefore defined \* \* \*.

[Minn.Stat. §] 297A.25 [(1978).] Exemptions. Subdivision 1. The following are specifically exempted from the taxes imposed by sections 297A.01 to 297A.44:

\* \* \* \* \*

(h) The gross receipts from the sale of and the storage, use, or consumption of all materials, \* \* \* used or consumed in \* \* \* industrial production of personal property intended to be sold ultimately at retail, whether or not the item so used becomes an ingredient or constituent part of the property produced.

The tax court held that payment by B. & B. to photographers for the intangible right to reproduce transparencies was not a "license to use" under § 297A.01, subd. 3(a); that payments to artists for their paintings was for a personal service and for the intangible right to reproduce the paintings; and hence that neither process was taxable.

As to the transparencies, the tax court reasoned that only the *intangible* right to reproduce was transferred to B. & B. since the photographers retained title to the transparencies. This was a purchase of a service, in the opinion of the court, and was not a "license to use" because the fee paid photographers for reproduction rights greatly exceeded the intrinsic value of the transparencies, which was an arrangement inconsistent with traditional concepts of a lease or license agreement.

With respect to paintings, the court found that although B. & B. took title to ninety percent of those it acquired, the paintings themselves had only nominal value, perhaps $10.00 each. On the other hand, B. & B. paid as much as $625.00 for the intangible right to reproduce them, that is, the copyright. Furthermore, the work done by artists, the court pointed out, is commissioned according to B. & B.'s specifications, frequently from a sketch the company furnishes the artist, which was completed under the direction of B. & B. who reserved the right to suggest and revise. Consequently, again the artist is in effect paid for personal services rather than for the finished product, the court concluded. The court cited as authority *Fingerhut Products Co. v. Commissioner of Revenue*, 258 N.W.2d 606 (Minn.1977) and *Commissioner of Revenue v. Safco Products Co.*, 266 N.W.2d 875 (Minn.1978) for arriving at a distinction between a service and a prod-

uct. It was the intent of the legislature, the court said, to tax only the ultimate product and thus avoid double taxation. Accordingly it applied the exemption accorded materials used and consumed in the chain of manufacturing.

The commissioner relies for reversal on Minn.Reg. Tax S & U 601 (1974) which provides as follows:

> Commercial Artists and Photographers. Commercial artists and photographers engaged in the creation or production of art work for sale to advertisers, printers and others for reproduction, display or use in the preparation or production of advertising or industrial materials, designs, etc., are regarded as retailers for sales and use tax purposes. Consequently, sales by them of * * * paintings, * * * transparencies * * * and all other forms of tangible personal property are subject to the sales and use tax, whether or not the materials utilized are furnished by the customer. The tax applies to the total price charged, including amounts attributable to personal services or models, preliminary or creative art, assistants, etc., whether or not separately stated on the bill or invoice. All preliminary or creative art service involved in a project which results in a sale of finished art is subject to tax, whether or not separately stated on the billing or invoice.

■ As applied to the facts in this case we hold that Regulation 601 is inconsistent with the exemption conferred by Minn.Stat. § 297A.25, subd. 1(h) (1978) and § 297A.01, subd. 4 (1978), and agree with the tax court's reasoning that to hold otherwise would result in the double taxation which these exemptions are designed to avoid. In our opinion, the purchase of the paintings are sales for the purpose of "resale in the regular course of business" to the extent that with exceptions hereafter noted they serve no function or purpose and have no value to B. & B. other than to be part of the process of converting them into decorative art work on playing cards, calendars, and other advertising specialties. *Midwestern Press, Inc. v. Commissioner of Taxation*, 295 Minn. 59, 203 N.W.2d 344 (1972).

■ As to the transparencies, B. & B. did not acquire title, and retained possession only long enough to reproduce the photographs. At the conclusion of the year for which a photograph is used on a calendar, the owner is at liberty to use, reproduce, or resell the photographs without any restrictions whatever. For liability purposes B. & B. always agrees with the owners that transparencies are worth only $15.00. However, it pays substantial amounts for the right to reproduce them, often several hundred dollars for each. Under these circumstances, it seems clear that what B. & B. bought was the copyright, an intangible, incorporeal right not subject to a sales tax. However, the commissioner points to that part of Minn.Stat. § 297A.01, subd. 3(a) (1978) which imposes a tax on the "leasing of or the granting of a license to use, or consume tangible personal property * *." We agree that this section would apply were it not for the exemption contained in § 297A.25, Subdivision 1(h) (1978) to which we have referred. Minn.Stat. § 297A.25, Subdivision 1 (1978) supersedes § 297A.01, subd. 3(a) (1978) by unequivocally stating: "The following are specifically exempted from the taxes imposed by sections 297A.01 to 297A.44."

The taxability of the paintings purchased by B. & B. presents a somewhat different and more difficult question of statutory construction. Here title actually passed to B. & B. Nevertheless it is undisputed that with few exceptions such as those done by Norman Rockwell for Boy Scout calendars, the paintings commissioned by B. & B. had little or no intrinsic value. As we have noted, B. & B. did pay substantial amounts for the right to reproduce, that is, the copyright. The paintings as such, when processed, were either returned to the artists, given away, or retained by B. & B. If any were sold, a sales tax was paid.

B. & B. was not in the business of buying paintings for any purpose other than to use them as a part of a manufacturing process, following which they had little more than salvage value.

■ Finally, the commissioner argues that under Minn.Reg. Tax S & U 605(b)(4) (1979) paintings and transparencies are not entitled to exemptions unless they become "physically an ingredient or component of the tangible personal property sold" by B. & B. We do not read the statute so narrowly. Nor do we agree that the right of reproduction is not "used or consumed in industrial production" within the meaning of the statute. The statutory scheme is to devise a unitary tax which exempts intermediate transactions and imposes it only on sales when the finished product is purchased by the ultimate user. The items here for consideration, in our opinion, fall into that category.

Affirmed.